UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━━━━━━━━━━━━━

ADELPHIA RECOVERY TRUST,

                      Plaintiff,

        v.                              DECISION AND ORDER
                                              09-CV–00215

KEY BANK NATIONAL ASSOCIATION, HSBC
BANK USA, NATIONAL ASSOCIATION AND
FLEET NATIONAL BANK,

                      Defendants.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━

### *Introduction*

This case requires the Court to determine whether the silence of a Chapter 11 debtor-in-possession in response to an inquiry by a bankruptcy judge while presiding over an asset-sale hearing in a closely-related debtor's bankruptcy about others' interests in the assets gave rise to judicial estoppel.  For the reasons described herein, this Court concludes that because Plaintiff, Adelphia Recovery Trust, actively participated in, facilitated and benefitted from the release of loans and sale of assets during the hearing, without disclosing potential claims, judicial estoppel bars Plaintiff from now asserting those claims.

### *Background*

The Court assumes the parties' familiarity with the relevant facts and prior proceedings in this case, which are summarized by the Second Circuit in

*Adelphia Recovery Trust v. HSBC Bank, USA*, *N.A.*, 634 F.3d 678, 682-89 (2d

Cir. 2011) ("*Adelphia Recovery Trust*") and in this Court's prior determination in

*HSBC Bank USA, N.A. v. Adelphia Communication Corp*., No. 07-cv-553A, 2009

WL 385474 at *1-6 (WDNY February 12, 2009).  As the Second Circuit

acknowledged in *Adelphia Recovery Trust,* "the facts of this case are, to put it

mildly, enormously complex."  634 F.3d at 682.  Therefore, this Court has

endeavored to simplify the facts by including only the relevant facts and prior

proceedings necessary for determining the issues presented here.

*The Buffalo Sabres Loans*

        During the 1990s, Key Bank National Association ("Key Bank"), HSBC

Bank USA, National Association ("HSBC") and Fleet National Bank ("Fleet Bank")

(collectively referred to as the "Banks") were lenders to Niagara Frontier Hockey,

LP ("NFHLP").  NFHLP owned the Buffalo Sabres, a professional hockey team.

        On May 10, 1995, the Banks entered into two loans with NFHLP.  The

loans had a combined face value of $67.5 million.  These loans were provided to

NFHLP for the building of the HSBC arena.  HSBC arena is the Buffalo Sabres

home hockey rink, located in Buffalo, New York.  One loan, totaling $35 million,

was made to finance the construction of the HSBC arena (the "Construction

Loan").  The second loan, totaling $32.5 million, was made to finance food and

concession equipment at the new arena (the "Concession Loan").  On February

28, 1997, NFHLP and Fleet Bank entered into a third loan which established a

revolving line of credit in favor of NFHLP in the principal amount of $12 million

(the "Revolver Loan").  Throughout this opinion, the Construction, Concession

and Revolver Loans are collectively referred to as the "Buffalo Sabres Loans" or

the "Loans".

In 2000, the Banks decided to sell all of their interests in the Buffalo Sabres

Loans to Adelphia Communications Corporation ("Adelphia"), through its

subsidiary, Sabres, Inc.  Adelphia was a publicly traded cable company founded

by John Rigas ("Rigas").  At its peak, Adelphia was the fifth-largest cable

company in the United States.  Sabres, Inc. was a Delaware corporation and a

wholly owned subsidiary of Adelphia.  The sole members of the Sabres, Inc.

board of directors were members of the Rigas family.

Adelphia (through Sabres Inc.) paid approximately $34.1 million to acquire

the Construction and Revolver Loans from the Banks.  The sale of the

Concession Loan was never finalized because consent of a third party could not

be obtained.  Instead, in 2002 and 2003, Adelphia made close to $14 million in

principal and interest payments to the Banks on the Concession Loan on

NFHLP's behalf.

At or around the same time that the Banks sold the Construction and

Revolver Loans to Adelphia, the Rigas family acquired NFHLP.  This acquisition

was carried out through Patmos, Inc., a Delaware corporation whose

shareholders consisted only of John Rigas and other members of the Rigas

family.  Plaintiff maintains that because NFHLP was in default on the Buffalo Sabres Loans and at risk of bankruptcy, Rigas and the Banks agreed that if Adelphia (through Sabres, Inc.) purchased the Loans, the Banks would give the necessary consent for the Rigas' (through Patmos) to purchase NFHLP and become the sole owners of the hockey team.  In order to facilitate the acquisition and recapitalization of NFHLP, Rigas caused Adelphia to transfer approximately $10 million to buy out the limited partners of NFHLP.  Plaintiff claims that the Banks were "intimately involved" in the discussions that resulted in the Rigas' acquisition and recapitalization of NFHLP.

The sale of the Buffalo Sabres Loans to Adelphia and the acquisition and recapitalization of NFHLP by Rigas enabled the Banks to prevent default or losses on the Loans.  At this time, Adelphia was a publically traded company controlled by the Rigas family as majority shareholders, and the Rigas' were the equitable owners of NFHLP.  Thus, these transactions left the Rigas family with a continued majority interest in Adelphia, ownership of NFHLP and control over the Buffalo Sabres hockey team.  Further, these transactions created a situation where Adelphia was creditor and NFHLP was debtor.  It is alleged that after the Loans were sold and Adelphia became NFHLP's largest secured creditor, Rigas caused Adelphia to invest over $200 million in NFHLP, despite inadequate benefit to Adelphia and detrimental effects on Adelphia's shareholders and creditors.

It was the Banks' role in the sale of the Buffalo Sabres Loans to Adelphia

4

and the acquisition and recapitalization of NFHLP by Rigas that would ultimately lead the Plaintiff in this action to bring fraudulent conveyance and aiding and abetting a breach of fiduciary duty claims against the Banks.

*The Bankruptcies and Sale of NFHLP*

In March of 2002, Adelphia disclosed publically that Rigas family members and affiliates had used Adelphia funds for personal purposes. In fact, it was disclosed that through massive financial fraud, the Rigas family and affiliates had borrowed approximately $2.3 billion that had not been listed on Adelphia's balance sheets. The company was potentially liable for billions of dollars in Rigas family debts. Soon thereafter, the NASDAQ exchange announced that it would delist Adelphia stock. In sum, Adelphia was facing complete financial collapse.

In June 2002 Adelphia filed for bankruptcy protection in the Bankruptcy Court for the Southern District of New York ("Adelphia Bankruptcy"). A month later, Rigas was arrested for bank, wire and securities fraud. He was ultimately sentenced to fifteen years in federal prison for looting the company and concealing approximately $2.3 billion in liabilities from Adelphia investors and creditors. *See United States v. Rigas*, 490 F.3d 208, 211-214 (2d Cir. 2007).

In January 2003 NFHLP filed for bankruptcy protection in the Bankruptcy Court for the Western District of New York ("NFHLP Bankruptcy"). Shortly thereafter, Hockey Western LLC ("Hockey Western") agreed to purchase NFHLP's assets. Because Adelphia owned the Construction and Revolver Loans

and made significant payments on NFHLP's behalf with respect to the

Concession Loan, Adelphia was NFHLP's largest secured and unsecured

creditor.  Therefore, Adelphia was given permission to appear as creditor in the

NFHLP Bankruptcy at the asset-sale hearing.  Since Adelphia was, by far, the

largest creditor of NFHLP, its claims had the potential to swamp those of all other

creditors.

Counsel for Adelphia appeared at the NFHLP asset-sale hearing by

telephone.  By law, Adelphia, which was by the time of the hearing operating

under new management, had the rights, powers and responsibilities of a trustee

in bankruptcy and debtor-in-possession.  *See* 11 U.S.C. §1107(a).  As debtor-in-

possession, it was the official representative of the Adelphia bankruptcy estate.

*See* 11 U.S.C. §323(a).

At the asset-sale hearing, Adelphia entered into a Stipulation and Order

agreeing to fully release the liens, security interests and guarantees that it held as

collateral for the Construction and Revolver Loans.  Adelphia further agreed that

the proceeds of the sale could be used to pay off the Concession Loan.

Specifically, Adelphia represented to the bankruptcy court that it was releasing its

rights to the collateral supporting the Buffalo Sabres Loans so that NFHLP could

be sold "free and clear" to Hockey Western, the hockey team could stay in

Buffalo, and the claims against NFHLP would not be overwhelmed by Adelphia's

claims.  In calculating the amount due on the Concession Loan, full credit was

given to the $11.3 million in principal and interest payments Adelphia had already paid since the Rigas' had acquired NFHLP in March of 2000.  Adelphia consented to a "cash out" amount of $21.4 million for the Concession Loan.

Also during the asset-sale hearing, counsel for Adelphia stated that as consideration for releasing its rights to the Construction and Revolver Loans, Adelphia would receive: (1) the release of two letters of credit totaling $27.6 million; and (2) assumption of an agreement for broadcast rights to the Buffalo Sabres for five years.  Further, Adelphia would be relieved of its obligation to continue making cash advancements–which between March 2000 and January 2003 were between $26 and $35 million–to the Buffalo Sabres franchise in order to protect its collateral.

 At the time of the asset-sale hearing, the Banks were also creditors of NFHLP.  Fleet Bank appeared at the sale hearing, but HSBC and Key Bank did not.  During the hearing, in an effort to ensure a proper asset sale and a complete resolution of all potential claims, the bankruptcy judge asked repeatedly whether everyone who had a legal, equitable or beneficial interest in the assets of any of the debtors had either appeared or signed a stipulation.  The bankruptcy judge also specifically asked whether any party wished to be heard (regarding anything having to do with the asset sale) or make an objection to the sale.  No one, including Adelphia, said a word.  In concluding that all necessary parties to the asset-sale were present, the bankruptcy judge stated:

7

> [W]hen I was reading the draft order and saw that all the parties who had liens and so forth would have consented and so forth, and I was wondering how we were going to get those and who they needed to be from, I was wondering how that was going to be handled and I guess what we have, having read the stipulations, is that everybody who anyone thinks actually has legal or equitable or beneficial interest in some kind of ownership or lien on the assets of these debtors have all signed the same stipulation; essentially identical stipulations, so we needn't worry about that unless there's some entity that slipped through the cracks, but I doubt that would have happened with the quality of representation that we have here.  So those who haven't seen them should rest assured that in fact the pertinent public officials and officers have, in fact, executed what is necessary to permit this sale.

*See Adelphia Recovery Trust v. HSBC Bank, USA, N.A.*, 634 F.3d 678, 686 (2d Cir. 2011) (*quoting* Tr. of Bankruptcy Sale Hearing at 42); *HSBC Bank USA, N.A. v. Adelphia Communication Corp.*, No. 07-cv-553A, 2009 WL 385474 at *11 (WDNY February 12, 2009) (*quoting same*)

Despite the bankruptcy judge's questioning, Adelphia's counsel never mentioned that it might file fraudulent conveyance claims or aiding and abetting a breach of fiduciary duty claim against the Banks based upon the Banks' sale of the Buffalo Sabres Loans to Adelphia, payments made by Adelphia on the Loans, or the acquisition and recapitalization of NFHLP.   As a result of the representations made by Adelphia and the other parties in attendance, including Adelphia's silence about potential causes of action against the Banks, the bankruptcy court issued an order approving Adelphia's release of its interests in the Buffalo Sabres Loans as well as the "free and clear" sale of NFHLP's assets to Hockey Western.

*The Southern District Adversary Proceeding*

In July 2003, less than three months after Adelphia appeared at the sale hearing and agreed to fully release its interests in NFHLP's assets, Adelphia and the Official Committee of Unsecured Creditors of Adelphia Communications Corporation (now "Adelphia Recovery Trust") (the "Trust")[1] filed a complaint in the Southern District of New York against hundreds of defendants, including the Banks ("Southern District Adversary Proceeding").  In the multi-party, multi-count complaint, the Trust claimed that the named defendants, including the Banks, helped perpetrate frauds committed by the Rigas family.  Claims 17-24 of the Complaint alleged fraudulent conveyances on the part of the Banks for receiving millions of dollars from Adelphia as part of the Buffalo Sabres Loan transactions (the "fraudulent conveyance claims").

The Trust specifically alleged that the March 2000 transfer of $34.1 million by Adelphia (through Sabres, Inc.) to the Banks in exchange for the Banks' interests in the Construction and Revolver Loans was an intentional or constructive fraudulent conveyance.  The Trust also alleged that the transfer of approximately $14 million by Adelphia to the Banks for payment of principal and

---

[1]The Trust is a Delaware statutory trust created pursuant to the Chapter 11 Plan of Reorganization following Adelphia's bankruptcy.  The Trust is the successor to the Official Committee of Unsecured Creditors of Adelphia and stands in the shoes of Adelphia.  As plaintiff in this action, the Trust is authorized to pursue certain causes of action held by Adelphia and to administer proceeds from those causes of action on behalf of the holders of interests in the Trust.

interest on the Buffalo Sabres Loans were further fraudulent conveyances.  In sum, the Trust claimed the Banks knew that the Loan sales and the principal and interest payments made by Adelphia were accomplished only to enrich the Rigas family entities and facilitate the Rigas' ownership of the Buffalo Sabres, and provided no benefit to Adelphia and its shareholders.

In response to the commencement of the Southern District Adversary Proceeding, the Banks filed proofs of claim in the NFHLP Bankruptcy.  The Banks asserted that since Adelphia appeared at the asset-sale hearing and failed to disclose the fraudulent conveyance claims to the bankruptcy court at that time, the Banks would have a claim against the NFHLP estate if the Trust were to obtain a favorable judgment on the fraudulent conveyance claim.  The NFHLP debtors then brought a declaratory judgment action seeking a declaration that the Banks' claims should be subordinated to other claims in the NFHLP Bankruptcy.

Subsequently, the Banks filed cross-claims in the NFHLP Bankruptcy, which was proceeding in the Western District, seeking to bar the fraudulent conveyance claims in the Adelphia Bankruptcy, which was proceeding in the Southern District.  In its cross-claims, the Banks argued that, among other things, the Trust should be judicially estopped from asserting its fraudulent conveyance claims because, as a result of Adelphia's silence at the sale hearing, neither the Banks nor the bankruptcy court were given notice of those claims.  The Banks maintained that estoppel arose when, during the asset-sale hearing, Adelphia

10

represented that it was the sole owner of the Buffalo Sabres Loans and agreed to the payoff of the Concession Loan, received other benefits, and put neither the bankruptcy court nor the Banks on notice of any possible claims.  The Banks alleged that if they had known at the time of the asset-sale hearing that the Adelphia debtor-in-possession was about to sue them for fraudulent conveyances, they would have objected to the sale of NFHLP free and clear of their liens on its assets.

The Banks later filed administrative claims in the Adelphia Bankruptcy and the NFHLP Bankruptcy (the "Administrative Claims").  The Administrative Claims asserted that if the Banks had to pay a judgment with respect to the fraudulent conveyance claims, the Banks would have an equal and offsetting claim against Adelphia in such an amount.

_Jurisdictional Order_

On June 14, 2004, in an effort to avoid dueling litigations in both the Western and Southern Districts, the Southern District Bankruptcy Court entered an order allowing the fraudulent conveyance claims to be litigated exclusively in the Western District Bankruptcy Court.  Specifically, the Southern District relinquished jurisdiction to the Western District to decide whether Adelphia's participation in the sale of NFHLP's assets estopped or released the Trust's fraudulent conveyance claims against the Banks in the Southern District Adversary Proceeding (the "Jurisdictional Order").  The Jurisdictional Order

11

provided:

> It is now ORDERED that leave is granted (and jurisdiction of this Court is relinquished) to the extent necessary, and only to the extent necessary, to permit defendants HSBC and Key Bank to obtain from the United States Bankruptcy Court for the Western District of New York a determination one way or the other as to whether the Adelphia debtors participation in the process of the sale of [NFHLP] debtors assets, and in the confirmation of the [NFHLP] debtors joint plan, estopped or released the Adelphia estates claim against HSBC and Key Bank in this Adversary Proceeding.  The same relief is extended to Fleet Bank[.]

*See In re Adelphia Communications Corp.*, AP No. 03-04942; Chap 11 Cases, Case No. 02-41729 (SDNY Bank. Ct. June 14, 2004).

The Western District Bankruptcy Court entered a reciprocal order accepting jurisdiction.  By decision and order dated March 2, 2007 and amended on March 22, 2007, the Western District Bankruptcy Court granted Fleet Bank's motion for summary judgment dismissing the Trust's fraudulent conveyance claims, but denied HSBC and Key Bank's respective summary judgment motions. An appeal to this Court followed.

*The Tort Claims*

In October of 2007, after the entry of the Western District Bankruptcy Court's decision on the fraudulent conveyance claims but before this Court's determination on appeal, the Trust filed an Amended Complaint. The Amended Complaint asserted additional claims against the Banks for aiding and abetting a breach of fiduciary duty (Count 56) and equitable subordination (Count 57)

(collectively referred to as the "tort claims").[2]

Count 56 alleges that the Banks aided and abetted Rigas' breach of fiduciary duty to Adelphia.  Like the fraudulent conveyance claims, the Trust's aiding and abetting a breach of fiduciary duty claim revolves, in significant part, around the Banks' sale of the Buffalo Sabres Loans to Adelphia, and the principal and interest payments made by Adelphia with respect to the Loans.  In sum, the Trust claims that the Banks aided and abetted Rigas' breach of fiduciary duty to Adelphia by: (1) selling the Buffalo Sabres Loans to Adelphia; (2) allowing Adelphia to make payments on the Loans; and (3) helping Rigas to acquire and recapitalize NFHLP.

Count 57 seeks equitable disallowance of the Banks' administrative claims or, alternatively, equitable subordination of those claims.  The equitable subordination claims involve the administrative claims filed by the Banks in the Adelphia Bankruptcy.  There, the Trust argues that because of the Banks' alleged misconduct, the Banks administrative claims should be equitably disallowed or subordinated in favor of Adelphia's other creditors.[3]

---

[2]On February 29, 2008 the Trust filed a Second Amended Complaint.  However, no additional substantive relief is sought against the Banks in the Second Amended Complaint.

[3]In response to the Trust's Amended Complaint, HSBC asserted the following counterclaims: (1) post-petition tort or negligent representation; (2) indemnification; and (3) contribution.  The post-petition tort claim is based upon alleged misrepresentations made by Adelphia to the bankruptcy court during the asset-sale hearing when Adelphia failed to disclose the tort claims.

*Present Proceeding*

On February 12, 2009, this Court dismissed the Trust's fraudulent conveyance claims against all of the Banks. *See HSBC Bank USA, N.A. v. Adelphia Communication Corp.*, No. 07-cv-553A, 2009 WL 385474 (WDNY February 12, 2009). This Court held, *inter alia*, that Adelphia's conduct at the NFHLP asset-sale hearing, namely its failure to disclose potential fraudulent conveyance actions against the Banks at the time it released its interests in the Buffalo Sabres Loans, estopped it from subsequently asserting fraudulent conveyance claims against any of the Banks.[4]

This Court's dismissal of the fraudulent conveyance claims was later affirmed by the Second Circuit Court of Appeals. *Adelphia Recovery Trust*, *supra*, 634 F.3d at 678. The Second Circuit concluded that judicial estoppel barred the Trust from pursuing fraudulent conveyance claims against the Banks because Adelphia facilitated the sale of NFHLP by asserting to the bankruptcy court that it was the only party with an interest in the Buffalo Sabres Loans, while remaining silent that it would later bring fraudulent conveyance claims against the Banks with respect to those Loans. *Id*.

---

[4]On March 5, 2009, while the Trust's appeal of this Court's dismissal of the fraudulent conveyance claims was pending before the Second Circuit, the Southern District of New York issued an order severing both the fraudulent conveyance claims and the tort claims from the Trust's Amended Complaint and permanently transferring them to the Western District of New York. *See Adelphia Recovery Trust v. Bank of America, N.A.*, No. 05-cv-9050, 2009 WL 636719 at *1 (SDNY March 5, 2009).

Since the Second Circuit has dismissed the fraudulent conveyance claims against the Banks on the basis of judicial estoppel, all that remains at issue before this Court are the Trust's tort claims against HSBC and Key Bank.[5]  As explained in detail below, this Court finds that judicial estoppel bars the Trust's tort claims. Specifically, this Court holds that Adelphia's silence about potential claims against the Banks during the NFHLP asset-sale hearing not only estops the Trust from pursuing fraudulent conveyance claims against the Banks, but also estops the Trust from pursuing the aiding and abetting a breach of fiduciary duty claim.  Further, because the equitable subordination claim is premised upon a finding of liability on the part of Defendants with respect to the aiding and abetting claim, the equitable subordination claim is dismissed as well.

## *Discussion*

### *Defendants' Motions*

HSBC has filed a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), dismissing the Trust's claims.  Key Bank has filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), also seeking dismissal of the claims.  Rule 12(c) allows for either party to move for judgment on the pleadings, "after the pleadings are closed but within such time as not to delay the trial."  *See* Fed. R. Civ. P. 12(c). This is similar to a Rule

---

[5]The Trust and Fleet Bank have entered into a settlement agreement and the Trust's claims with respect to Fleet Bank have been dismissed.  Fleet Bank is no longer a party to this action.

12(b)(6) motion to dismiss for failure to state a claim, except that a Rule 12(b)(6)

motion comes before the close of the pleadings.  *See* Fed. R. Civ. P. 12(b)(6);

*Pifko v. CCB Credit Services, Inc.*, No. 09-cv-0357, 2010 U.S. Dist. Lexis 69872,

*5 (EDNY July 7, 2010).  In either case, the court should apply the same

standard.  *Id.*; *see also Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644

(2d Cir. 1998).

Specifically, for both 12(b)(6) and 12(c) motions, a district court must

accept the factual allegations contained in the complaint as true and draw all

reasonable inferences in favor of the non-moving party.  *Lesbian & Gay Org.,*

*supra,* 143 F.3d at 638.  The factual allegations contained in the complaint must

satisfy a flexible plausibility standard, which obliges a pleader to amplify a claim

with enough factual allegations to render the claim plausible.  *Iqbal v. Hasty*, 490

F.3d 143, 157-58 (2d Cir. 2007).  Generally, the complaint must raise a right to

relief above the speculative level.  *Bell Atl. Corp. v. Twombly*, 550 US 544, 555

(2007).

Both Key Bank and HSBC set forth a number of arguments in favor of their

respective motions to dismiss, including judicial estoppel.  As indicated previously

and will be explained in detail below, this Court determines that Plaintiff's tort

claims are barred in their entirety based upon the doctrine of judicial estoppel.

Therefore, even though Defendants have moved to dismiss Plaintiff's claims

under Rule 12(c) and Rule 12(b)(6), this Court does not need to evaluate

16

Plaintiff's pleadings pursuant to the standards set forth in the Federal Rules of Civil Procedure. Instead, the Court's decision focuses primarily on why Plaintiff's prior behavior at the asset-sale hearing estops them from now bringing the claims at issue here, notwithstanding the content and adequacy of Plaintiff's pleadings.

*The Doctrine of Judicial Estoppel Bars the Trust's Aiding and Abetting a Breach of Fiduciary Duty Claim Against Key Bank and HSBC.*

The doctrine of judicial estoppel prevents a litigant from asserting a position or claim in a legal proceeding that is inconsistent with a position or claim taken by that litigant in a previous proceeding. *See Moore's Federal Practice* §134.30, pp. 134-62 (3d ed. 2000); *Pegram v. Herdrich*, 530 U.S. 211, 227 (a party cannot prevail in one phase of a case on an argument and then rely on a contradictory argument to prevail in another phase). It is consistently recognized that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

In *Adelphia Recovery Trust*, *supra* 634 F.3d at 695-96, the Second Circuit recognized that judicial estoppel will bar a claim if: (1) a party's former position is "clearly inconsistent" with its earlier position; (2) the party's former position has been adopted in some way by the court in the earlier proceeding; and (3) the

17

party asserting the two positions would derive an unfair advantage against the party seeking estoppel.  *See also DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010).  As explained below, each of the three enumerated requirements of judicial estoppel are met with respect to the aiding and abetting a breach of fiduciary duty claim.

To begin, the Trust took an inconsistent position at a prior proceeding.  At the sale hearing, Adelphia represented that it alone had an interest in the Construction and Revolver Loans and, as such, its liens on those loans could be released "free and clear" in favor of the purchaser, Hockey Western.  Adelphia also took the position that the proceeds of the sale could be used to pay off the Concession Loan.  Most significantly, Adelphia wholly failed to disclose that it was considering bringing an aiding and abetting a breach of fiduciary duty claim against the Banks.  Adelphia's position at the hearing, as well as its silence regarding the potential claims against the Banks, led the bankruptcy court to conclude that there were no issues or concerns with respect to the release of the Buffalo Sabres Loans and the "free and clear" sale of NFHLP.  Moreover, Adelphia's representations led the bankruptcy court to determine that no additional parties needed to be notified of or included in the sale of NFHLP's assets.

Now, in contrast, the Trust vigorously maintains that the Banks' sale of the Loans to Adelphia aided and abetted Rigas' breach of fiduciary duty to Adelphia.

Specifically, the Trust claims that the Banks would not consent to the ownership transfer of NFHLP to Rigas until the parties agreed that Adelphia (via its subsidiary Sabres, Inc.) would purchase the Buffalo Sabres Loans, even though the purchase was not beneficial to Adelphia.  The Trust also asserts that the Banks were aware that Rigas was causing Adelphia to make payments on the Buffalo Sabres Loans, even though Adelphia was not the debtor and received no benefit from those payments.  The Trust seeks the same relief from the aiding and abetting a breach of fiduciary duty claim as it did from the fraudulent conveyance claims, namely, the return of the $48 million that Adelphia paid to the Banks to purchase the Loans and made in principal and interest payments.  In addition, the Trust seeks recovery of the $10 million that Adelphia paid to the limited partners of NFHLP to facilitate Rigas' acquisition of NFHLP and the hockey team.

The Trust's current aiding and abetting claim is clearly inconsistent with Adelphia's prior position at the sale hearing, during which Adelphia remained silent about the claim and represented that no other party had an interest in either the release of the Buffalo Sabres Loans or the sale of NFHLP's assets.  Had Adelphia revealed, at the sale hearing, that it planned to file a multi-million dollar lawsuit against the Banks based, in significant part, on the Loan sale transactions and payments made with respect to the Loans, the release of the Loans and the sale of NFHLP would not have proceeded without, at a minimum, providing the

Banks with notice and opportunity to be heard regarding those potential claims. Indeed, such notification would have been essential to ensure a fair and complete sale proceeding.

In *Adelphia Recovery Trust*, *supra*, 634 F.3d at 697, the Second Circuit opined that judicial estoppel "is not concerned with the repose of individual claims but with the ability of courts to render their decisions based on faithful representations by counsel."  Here, by asking the parties present at the asset-sale, including Adelphia, whether all parties with potential interests or claims had been accounted for, the bankruptcy judge made a careful attempt to ensure that everyone with an interest in the outcome of the sale proceeding was present before the sale of NFHLP was completed.  It is evident that had Adelphia disclosed at the sale hearing that it might later pursue an aiding and abetting a breach of fiduciary duty claim against the Banks based in large part on the Loan transactions and payments, the sale hearing would not have proceeded in the same speedy and uncontested manner.

In applying judicial estoppel to bar the Trust's fraudulent conveyance claims, the Second Circuit found it most significant that Adelphia's failure to disclose those claims at the sale hearing deprived the bankruptcy court of the opportunity to fairly and efficiently resolve all of the potential claims with respect to the Loan transactions.  *Adelphia Recovery Trust, supra*, 634 F.3d at 699.  The Second Circuit surmised that:

20

> [B]y failing adequately to ensure that all of its lawyers were mindful of these *potential causes of action*, [Adelphia] allowed the mechanism for fair and efficient resolution of its fraudulent conveyance actions to slip away, foregoing the speedy resolution of their claims at the sale hearing for a lengthy and costly proceeding in the NFHLP bankruptcy court on this appeal.

*Id.* (emphasis added).  The Second Circuit's reasoning in *Adelphia Recovery Trust* applies equally to the aiding and abetting a breach of fiduciary duty claim presently before this Court.  Indeed, like the fraudulent conveyance claims, the aiding and abetting claims were among the *potential causes of action* which Adelphia should have disclosed at the time of the sale hearing.  By failing to disclose them, just as it failed to disclose the fraudulent conveyance claims, Adelphia deprived the bankruptcy court of reaching a "fair and efficient resolution" of those claims. Because Adelphia remained silent regarding the aiding and abetting a breach of fiduciary duty claim, the Trust is now estopped from asserting it.

The Trust contends that the Second Circuit's decision in *Adelphia Recovery Trust* is distinguishable because by failing to disclose the fraudulent conveyance claims at the sale hearing, the Banks were deprived of the opportunity to object to the asset sale and rescind the original loan transfers. The Trust maintains that rescission is not available in an action for aiding and abetting a breach of fiduciary duty claim.  Thus, the Trust concludes that since it is monetary damages rather than rescission which is at stake here, their position at

the sale hearing is not inconsistent with their current position.  In other words, the

Trust argues that their position at the sale hearing that the Loans could be

released free and clear is not inconsistent with their position now that they are

owed monetary damages because the Banks aided and abetted Rigas' breach of

fiduciary duty.  In response, Defendants contend, *inter alia*, that rescission is a

potential remedy for an aiding and abetting a breach of fiduciary duty claim and

therefore the positions remain inconsistent.

The Court finds that regardless of the potential remedy for the Trust with

respect to the aiding and abetting a breach of fiduciary duty claim, what is most

significant is that if Adelphia had disclosed the possibility of any claim against the

Banks arising from the same operative facts as the fraudulent conveyance

claims, both the bankruptcy court and the Banks would have approached the

asset sale very differently.  This represents a key reason as to why the Trust's

positions are deemed inconsistent.

This reasoning is consistent with the Second Circuit's application of judicial

estoppel in *Adelphia Recovery Trust*.  Indeed, in assessing the Trust's fraudulent

conveyance claims, the Second Circuit acknowledged that "Adelphia could have

pursued a money judgment notwithstanding the possibility of rescission even

after the asset sale, and thus it might be argued that [the Trust's] current position

is not clearly inconsistent with its silence at the asset sale." *Adelphia Recovery

Trust*, *supra*, 634 F.3d at 697.  The Second Circuit proceeded to determine that

22

even though monetary damages were still available with respect to the fraudulent conveyance claim, the Trust's respective positions remained inconsistent.  The Second Circuit opined, "[w]e think it enough that both the bankruptcy court and the banks undoubtedly would have approached the sale differently had Adelphia disclosed the possibility of fraudulent conveyance actions at the sale hearing."  *Id*.

This Court draws the same conclusion with respect to the aiding and abetting a breach of fiduciary duty claim.  While the parties may disagree as to whether rescission of the Loan transactions would have been an available remedy in an aiding and abetting a breach of fiduciary duty claim, it cannot be disputed that both the Banks and the bankruptcy court would have proceeded differently at the sale hearing had this claim been disclosed.  The Trust's aiding and abetting a breach of fiduciary duty claim arises, in significant part, from the $48 million which Adelphia paid to the Banks for the Buffalo Sabres Loans as well as in principal and interest.  Had the bankruptcy court been provided with this information, it likely would have suspended the proceeding, provided notice to the Banks, and allowed the parties an opportunity to settle these disputes before the Loans were released and an asset sale finalized.  The fact that rescission of the Loans may not have been an available remedy is not determinative.

Judicial estoppel is properly applied because Adelphia's silence interfered with the integrity of the judicial system by depriving the bankruptcy court of the ability to address potential claims at the time of the sale hearing.  In fact, the

bankruptcy judge specifically stated that if the bankruptcy court had been informed that Adelphia was reserving its right to bring fraudulent conveyance actions in its own bankruptcy proceeding, it "would not have approached the sale without the consent of the banks or a full-blown resolution as to who owned the lean rights."  *Adelphia Recovery Trust*, *supra*, 634 F.3d at 688.  It cannot be the case that the bankruptcy court would have taken any different view if the tort claims, as well as the fraudulent conveyance claims, had been disclosed.  While it is not the typical case that a party's silence with respect to claims will result in the estoppel of those claims, it is the appropriate result here, where the silence of a party with respect to potential claims caused a court to proceed much differently than it would have, had it been made aware of the claims.  Indeed, in *Adelphia Recovery Trust*, *supra*, 634 F.3d at 697, the Second Circuit noted that "it will be the rare case in which the silence of a party (or its counsel) is not adequate to cause ratification but exposes the party to judicial estoppel, but this is that rare case."

The Trust also claims that the Second Circuit's application of judicial estoppel to the fraudulent conveyance claims is distinguishable from the instant matter because the damages stemming from the fraudulent conveyance claims are not identical to the damages that would result from the aiding and abetting a breach of fiduciary duty claim.  Specifically, the Trust claims that if it were to prevail on its aiding and abetting claim it would be entitled not only to the $48

24

million which Adelphia paid the Banks for the Loans as well as in principal and interest (damages which also would have been available in the fraudulent conveyance actions), but also to the $10 million that Adelphia paid for the recapitalization of NFHLP (Adelphia claims that this amount would not have been paid absent the Banks' aiding and abetting).

Just as the potential rescission of the Loans is not a critical factor in determining whether judicial estoppel applies here, it is not determinative that additional damages may be available to the Trust if it were permitted to pursue the aiding and abetting a breach of fiduciary duty claim against the Banks. The purpose of judicial estoppel is to prevent parties from using inconsistent positions in different proceeding to their advantage. *Galin v. Goldfishcer*, No 03 Civ. 9019, 2008 US Dist. LEXIS 106603 (SDNY December 31, 2008). As explained above, the fact that monetary damages may still be available with respect to either the fraudulent conveyance or aiding and abetting claim does not counsel against the application of judicial estoppel. Here, the Court finds that Adelphia should not be permitted to proceed on the aiding and abetting a breach of fiduciary duty claim because its silence about those claims prevented the bankruptcy court from reaching an efficient and fair resolution of the matter at the time of the sale hearing.

The second element of judicial estoppel requires that the party's earlier position be adopted by the court or administrative body in the prior proceeding.

25

Here, Adelphia represented that it was the only party with an interest in the Loans, and failed to disclose its potential causes of action against the Banks arising, in significant part, from the sale and payments of those Loans. Adelphia's representations were indispensable to the bankruptcy court's willingness to enter into the NFHLP sale order.

The final element of judicial estoppel requires a showing that the party received an unfair advantage based upon its inconsistent positions. Here, the Trust gained the same unfair advantage in failing to disclose the aiding and abetting a breach of fiduciary duty claim that it did in failing to disclose the fraudulent conveyance claims. Indeed, the Loans were released and NFHLP was sold without delay or objection. As consideration for releasing its interests in the Construction and Revolver Loans, Adelphia received two letters of credit totaling $27.6 million, assumption of a five-year agreement to broadcast rights for the Buffalo Sabres, and relief of its obligation to continue making cash advancements to the Buffalo Sabres franchise in order to protect its collateral. Adelphia received these benefits by remaining silent regarding the potential fraud and tort claims, therefore allowing the asset sale to proceed uncontested and uninterrupted. At the same time, the Trust's ability to bring an aiding and abetting a breach of fiduciary duty claim against the Banks, based in large part on the Loan transactions and the Banks relationship with NFHLP, was preserved. The Trust's silence was fundamentally unfair because while Adelphia received the benefit of

26

the immediate release of the Loans and sale of NFHLP and the Trust preserved

its ability to bring fraud and tort claims against the Banks, the bankruptcy court

was deprived of the opportunity to attempt to resolve the claims prior to the sale

of the assets.

This Court finds the Trust's remaining arguments against the application of

judicial estoppel also unpersuasive.  The Trust maintains that while there was a

short time between the sale hearing and assertion of the fraudulent conveyance

claims, a number of years have passed between the sale hearing and the

assertion of the aiding and abetting a breach of fiduciary duty claim.  The Trust

emphasizes that in *Adelphia Recovery Trust* the Second Circuit was particularly

concerned with the fact that the fraudulent conveyance claims were brought only

a few months after the sale hearing, indicating that the Trust was actually aware

of the existence of those claims at the time of the sale hearing.  The Trust

attempts to distinguish the present claims by asserting that it was not until years

after the sale hearing that it discovered the factual elements necessary to

establish the aiding and abetting a breach of fiduciary duty claim.

However, the application of judicial estoppel is not dependent upon the

amount of time that has passed between a party's assertion of inconsistent

positions, but instead focuses on the inconsistency itself and its effect on the

Courts and other litigants.  *See New Hampshire v. Maine*, 532 U.S. 742 (2001)

(In a dispute over a state border in 2001, the Supreme Court found that New

27

Hampshire was prohibited from asserting a position contrary to the position it asserted in a 1977 consent decree).  Further, while judicial estoppel does not apply when a party's position is based upon mistake or inadvertence, it does not require purposeful deceit.  *New Hampshire, supra,* 532 U.S. at 749-50 (the purpose of judicial estoppel is not to look for, or punish, outright lies, but "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.")  Here, it is enough that the Trust was aware that it had some claims against the Banks arising in whole or part from the Loan transactions, yet failed to disclose any of them.

Because all three elements of judicial estoppel have been met, the Trust's aiding and abetting a breach of fiduciary duty claim against HSBC and Key Bank is dismissed.

*Equitable Subordination*

The Trust's claim for equitable subordination or equitable disallowance relates to Defendants' administrative claims in the Adelphia Bankruptcy. Specifically, HSBC and Key Bank claim that if they are found liable in the present action, they have a claim against the Adelphia estate in the bankruptcy proceeding since the Trust remained silent at the asset sale regarding the instant tort claims.  Conversely, the Trust argues that because of HSBC and Key Bank's alleged misconduct, namely the alleged aiding and abetting a breach of fiduciary

28

duty, HSBC and Key Bank's administrative claims should be either subordinated or disallowed in favor of Adelphia's other creditors.

"The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interests of the other creditors." *In re Applied Theory Corp*., 345 B.R. 56, 59 (SDNY 2006).  A creditor's claim may be equitably subordinated if the party seeking subordination establishes the following: (1) the claimant engaged in inequitable conduct; (2) the inequitable conduct resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with bankruptcy laws. *In re Blumenberg*, 263 B.R. 704, 720 (Bankr. Ct. EDNY 2001).  The party seeking equitable subordination or disallowance of the claims bears the burden of proof.  Fraud, illegality, breach of fiduciary duty, undercapitalization, or control or use of the debtor as an alter ego is generally the type of misconduct that warrants the equitable subordination of a claim.  *80 Nassau Assoc. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assoc.)*, 169 B.R. 832, 838 (Bankr. Ct. SDNY 1994).

Further, the Second Circuit has generally held that where a litigant seeks to subordinate the claim of a party who is neither an insider of the debtor, nor a fiduciary to the debtor or other creditors, a higher level of proof is needed.  *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc*., 210 B.R. 508, 515 (Bankr. Ct. SDNY 1997).  In short, when a non-insider or non-fiduciary is involved, egregious or "severely unfair" conduct must be shown before the claim is subordinated.  *In*

*re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1360 (1st Cir. 1992).  The

conduct required has been described as "substantial misconduct tantamount to

fraud, misrepresentation, overreaching or spoilation."  *Nassau Assocs*., *supra*,

169 BR at 838-39.

        This Court acknowledges that the Trust has alleged conduct on the part of

the Banks which may state a claim for equitable subordination.  However, the

Court does not have to render a determination with respect to the adequacy of

the Trust's pleading.  The administrative claims are based upon a finding of

liability on the part of HSBC and Key Bank with respect to the Trust's claim for

aiding and abetting a breach of fiduciary duty.  Since, as detailed above, the

aiding and abetting claim is estopped and will be dismissed, HSBC and Key

Bank's administrative claims will be rendered moot.  Thus, the Trust's claim for

equitable subordination of those administrative claims is also rendered moot and

likewise is dismissed.

<u>HSBC and Key Bank's Additional Defenses</u>

        The Banks' cross-claims against the Trust requested an order "bar[ring] the

Adelphia Debtors from pursuing any existing claims or causes of action against

[the Banks] concerning the Adelphia allegations."  The Banks sought to define the

term "Adelphia Allegations" as all of the factual allegations asserted with respect

to the fraudulent conveyance claims.  The Banks requested relief pursuant to the

doctrines of res judicata, judicial estoppel and equitable estoppel.

In the present proceeding, HSBC argues that the Jurisdictional Order, considered together with this Court's order dismissing the fraudulent conveyance claims and granting HSBC's cross-claims, bars the Trust's tort claims. In sum, HSBC maintains that even though the tort claims had not been asserted at the time the cross-claims were made, the tort claims are "within the broad class of claims and causes of actions which HSBC's prior motion sought to bar in its cross-claims." HSBC therefore concludes that this Court's decision with respect to the cross-claims also operated as a bar to Trust's tort claims. Conversely, the Trust argues that the Jurisdictional Order contained a limited grant of jurisdiction, allowing this Court to consider issues related to the fraudulent conveyance claims only.

This Court does not conclude that its prior decision on HSBC's cross-claims operates to bar the tort claims as well. The June 2004 Jurisdictional Order applied only to the claims then pending against HSBC and Key Bank in the Southern District Adversary proceeding, namely the fraudulent conveyance claims. This Court does not find that the language of HSBC's cross claims, which sought to bar all claims and causes of action arising from the "Adelphia Allegations" operated to preclude tort claims which had not yet been asserted. Therefore, this Court's prior determination on the cross-claims dismissed the fraudulent conveyance claims only.

In March 2009, after the Complaint had been amended to include the tort

31

claims, the Southern District of New York entered an order severing both the fraudulent conveyance claims and the tort claims from the Trust's amended complaint and permanently transferring those claims to this Court. As explained above, this Court has concluded that the tort claims, like the fraudulent conveyance claims, are barred by the doctrine of judicial estoppel and will be dismissed.

Also in support of their motion to dismiss, HSBC and Key Bank assert that the tort claims are untimely and fail to state a viable claim for aiding and abetting a breach of fiduciary duty. Because this Court has determined that the Trust's tort claims are barred based upon the doctrine of judicial estoppel, it will not examine the merits of these additional defenses.

*HSBC's Counterclaims*

As noted above, in March of 2008 HSBC filed its answer to the Trust's Amended Complaint. At that time, HSBC asserted a counter-claim against the Trust for post-petition tort or negligent misrepresentation. HSBC's post-petition tort claim is based upon the alleged misrepresentations made by Adelphia to the bankruptcy court, at the NFHLP asset-sale hearing, that it was the only party with an interest in the Buffalo Sabres Loans. In order to state a claim for negligent misrepresentation under New York State law, a party must demonstrate: (1) the existence of a special or a privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was

32

incorrect; and (3) reasonable reliance on that information. *J.A.O. Acquisition Corp. V. Stavitsky*, 8 N.Y.3d 144, 148 (2007). HSBC argues that its damages will consist of: (1) any liability found for aiding and abetting Rigas' breach of fiduciary duty; and (2) the attorney's fees it has incurred in this action.

For the reasons set forth above, the Trust's aiding and abetting a breach of fiduciary duty claim is dismissed as a result of judicial estoppel. Therefore, HSBC will have no damages emanating from this claim. Further, the Second Circuit does not recognize attorney's fees as damages flowing from a common law tort such as negligent misrepresentation. *Goldberg v. Mallinckrodt*, *Inc.*, 792 F.2d 305, 309 (2d Cir. 1986). Counsel fees and the legal expenses necessarily incurred in carrying on a lawsuit are not generally considered items of expense recoverable as general or special damages, unless a specific statute or contractual provision so provides. *Coopers & Lybrand v. Levitt*, 52 A.D.2d 493 (1st Dept. 1976). Here, HSBC is asserting a common law tort for negligent misrepresentation. There is no statute or contractual provision which provides for attorney's fees with respect to such a claim. Since there are no damages available to HSBC, its counterclaim for negligent misrepresentation or post-petition tort is dismissed.

HSBC also asserts counterclaims for contribution and indemnification. HSBC's claim for contribution provides that "in the event it is determined that HSBC has any liability for the Adelphia Debtors and Adelphia Trust, HSBC is

33

entitled to contribution and indemnification for a percentage of any damages."

HSBC's claim for indemnification is based upon a letter, executed by Adelphia in

favor of the Banks, which provides that "Adelphia indemnifies and holds each

Sabres Bank harmless from any claim relating to the Assignment and Transfer [of

the Loans]."  Since the Trust's claim for aiding and abetting a breach of fiduciary

duty is dismissed, HSBC's contribution and indemnification claims are rendered

moot and are also dismissed.[6]

### *Conclusion*

For the reasons stated above, the Court: (1) grants HSBC's motion for

judgment on the pleadings; (2) grants Key Bank's motion to dismiss; and (3)

dismisses HSBC's counterclaims.


SO ORDERED.


*s/ Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: May 18, 2012

---

[6]During oral argument on Defendants' Motions to Dismiss, counsel for HSBC
stated that should this Court dismiss the Trust's tort claims, HSBC would accept
dismissal of its counterclaims.  For this reason, as well as the reasons stated herein,
HSBC's counterclaims are dismissed in their entirety.